[ORAL ARGUMENT NOT YET SCHEDULED]
No. 12-5286

_____

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SECURITIES AND EXCHANGE COMMISSION,
Petitioner-Appellant,

v.

SECURITIES INVESTOR PROTECTION CORPORATION,
Respondent-Appellee.

_____

On Appeal from the United States District Court for the District of Columbia

_____

## INITIAL BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, APPELLANT

_____

MICHAEL A. CONLEY
Deputy General Counsel

JACOB H. STILLMAN
Solicitor

JOHN W. AVERY
Deputy Solicitor

TRACEY A. HARDIN
Assistant General Counsel

MICHAEL L. POST
Senior Litigation Counsel
Securities and Exchange Commission
100 F St., N.E.
Washington, D.C. 20549
(202) 551-5011 (Post)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici.**  The parties who have appeared before the district court are:  Securities and Exchange Commission, Applicant, and Securities Investor Protection Corporation, Respondent.  Richard R. Cheatham moved to intervene in the district court and the district court denied his motion to intervene.  No *amici* appeared before the district court.  The parties in this Court are:  Securities and Exchange Commission, Appellant, and Securities Investor Protection Corporation, Appellee.  No *amici* have appeared before this Court.

**B.    Rulings Under Review.**  The United States District Court for the District of Columbia, Judge Robert L. Wilkins, issued the order under review, *SEC v. SIPC*, 872 F. Supp. 2d 1 (D.D.C. July 3, 2012).

**C.    Related Cases.**  Except for the proceedings below leading to the order under review, the case on review was not previously before this Court or any other court. Richard Cheatham's appeal from the district court's denial of his motion to intervene is No. 12-5304 in this Court.  Counsel for the Commission are not aware of any other related cases currently pending in this Court or any other court.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ........................................................................v

GLOSSARY................................................................................................x

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF JURISDICTION............................................................3

STATEMENT OF THE ISSUES PRESENTED..........................................4

STATEMENT OF THE CASE....................................................................4

A.    Nature of the Case .........................................................................4

B.    Relevant Statutory and Regulatory Scheme ...................................5

        1.    The Securities Investor Protection Act of 1970 ...................5

        2.    Liquidations under SIPA .....................................................8

C.    Statement of the Facts...................................................................10

D.    Course of Proceedings ...................................................................16

        1.    SIPC's Customer Need Determination ...............................16

        2.    The Commission's Customer Need Determination and Formal Request to SIPC....................................................17

        3.    Proceedings in the District Court .......................................20

                a.    The Commission's Section 11(b) Application .........20

ii

Page

       b.     February 9 Order as to the Nature of the Proceeding and
              Scope of Review ...................................................................20

       c.     July 3 Order as to the Standard of Proof and SIPA's
              "Customer" Definition ...........................................................21

STANDARD OF REVIEW ...................................................................24

SUMMARY OF ARGUMENT .................................................................25

ARGUMENT ...................................................................................28

I.     The probable cause standard applicable when SIPC itself seeks to
      initiate a SIPA liquidation should likewise be applied to the
      Commission, as SIPC's plenary supervisor, in this preliminary,
      summary proceeding....................................................................28

      A.     Congress intended the procedural protections of SIPA to be
            available where there is probable cause to believe that there are
            customers in need of protection. ...........................................29

           1.     It is inconsistent with SIPA to require a heightened
                 standard of proof prior to the initiation of a liquidation. ..........29

           2.     SIPA's overarching goal of speedy relief for investors
                 supports the use of the more expeditious probable cause
                 standard. ...................................................................32

           3.     SIPC is held only to a probable cause standard when it
                 applies to initiate a liquidation.................................................34

      B.     Given the Commission's role as SIPC's plenary supervisor, the
            same probable cause standard should govern Commission
            applications to require SIPC to seek to initiate a liquidation.............36

      C.     The district court's reasoning in holding that a preponderance
            standard applies was incorrect...........................................38

Page

1.  There is no basis for the district court's analogy to
    Exchange Act Section 21(e)......................................................39

2.  The district court failed properly to consider the statutory
    relationship between the Commission and SIPC....................42

II. The record provides sufficient cause to believe that there are
    customers who may need the protections of SIPA.........................................44

A.  The district court's reasoning improperly elevates form over
    substance by strictly adhering to the corporate form of the
    Stanford entities rather than recognizing they were operated as
    a single fraudulent enterprise. .............................................45

B.  Even apart from the lack of separateness of the corporate
    entities, SIPA's "customer" definition includes those who can
    be deemed to have deposited cash with a broker-dealer under
    the *Old Naples* and *Primeline* cases...................................50

C.  The Commission's interpretation of SIPA's "customer"
    definition is at least reasonable and warrants *Chevron*
    deference.................................................................................54

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES**

<u>Page</u>

Aaron v. SEC, 446 U.S. 680 (1980) ....................................................40

American Petroleum Institute v. EPA, 684 F.3d 1342 (D.C. Cir. 2012) ...............57

In re Atkeison (Ambassador Church Finance/Development Group),
   446 F. Supp. 844 (M.D. Tenn. 1977) ................................................ 47-48

In re Auto-Train Corp., Inc., 810 F.2d 270 (D.C. Cir. 1987) ................................47

In re Babcock and Wilcox Co., 250 F.3d 955 (5th Cir. 2001) ................................47

Bell v. Burson, 402 U.S. 535 (1971) .....................................................31

In re Bell & Beckwith, 66 B.R. 703 (N.D. Ohio 1986)...........................................49

In re Bernard L. Madoff Investment Securities, LLC,
   424 B.R. 122 (Bankr. S.D.N.Y. 2010) ................................................19

In re Bernard L. Madoff Investment Securities, LLC,
   654 F.3d 229 (2d Cir. 2011), *cert. denied,* 133 S. Ct. 24 (2012) ...............19, 24, 54

Bloate v. United States, 130 S. Ct. 1345 (2010).....................................................40

Cablevision Systems Corp. v. FCC, 649 F.3d 695 (D.C. Cir. 2011) ......................57

Castleberry v. Branscum, 721 S.W.2d 270 (Tex. 1986)..........................................48

Chevron, U.S.A., Inc. v Natural Resources Defense Council, Inc.,
   467 U.S. 837 (1984) ...................................................................45, 54

In re Comshare, Inc. Securities Litigation, 183 F.3d 542 (6th Cir. 1999)...............24

*Authorities upon which we chiefly rely are marked with asterisks.

v

**CASES (cont.)**

Page

C.I.R. v. Shapiro, 424 U.S. 614 (1976)..............................................................31-32

In re C.J. Wright & Co., Inc., 162 B.R. 597 (Bankr. M.D. Fla. 1993)........19, 49, 54

In re First State Securities Corp., 34 B.R. 492 (Bankr. S.D. Fla. 1983) .................49

Gerstein v. Pugh, 420 U.S. 103 (1975)............................................................31, 45

Herman & MacLean v. Huddleston, 459 U.S. 375 (1983)...............................22, 43

Janvey v. Democratic Senatorial Compaign Committee, Inc.,
   793 F. Supp. 2d 825 (N.D. Tex. 2001).........................................................11, 46

Janvey v. Alguire, 647 F.3d 585 (5th Cir. 2011).....................................................46

In re Lewellyn, 26 B.R. 246 (Bankr. S.D. Iowa 1982) ....................................47, 48

Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir. 1972) ..................32

Mathews v. Eldridge, 424 U.S. 319 (1976) ............................................................31

In re Mirus, 87 B.R. 960 (Bankr. N.D. Ill. 1988) ...................................................49

New Hampshire Fire Insurance Co. v. Scanlon, 362 U.S. 404 (1960)....................45

In re New Times Securities Services, Inc.,
   371 F.3d 68(2d Cir. 2004) ................................................... 30, 37-38, 47, 49

In re New Times Securities Services, Inc.,
   No. 8-00-8178-jbr (Bankr. E.D.N.Y. Nov. 27, 2000) .......................................47

*In re Old Naples Securities, Inc.,
   223 F.3d 1296 (11th Cir. 2000)................................. 18, 30, 45, 49, 50, 51, 52, 53

In re Old Naples Secs., Inc., 311 B.R. 607 (M.D. Fla. 2002)...........................19, 54

In re Old Naples Securities, Inc., 218 B.R. 981 (Bankr. M.D. Fla. 1998) .............52

## CASES (cont.)

Page

\*In re Primeline Securities Corp.,
  295 F.3d 1100 (10th Cir. 2002).......................................18, 49, 51, 53, 54

SEC v. Alan F. Hughes, Inc., 461 F.2d 974 (2d Cir. 1972)...............................34, 45

SEC v. International Loan Network, Inc., 770 F. Supp. 678 (D.D.C. 1991) .........41

SEC v. McCarthy, 322 F.3d 650 (9th Cir. 2003)................................................41, 45

SEC v. Moran, 922 F. Supp. 867 (S.D.N.Y. 1996) ............................................41

SEC v. Savoy Industries, Inc., 587 F.2d 1149 (D.C. Cir. 1978) .....................40, 41

SEC v. SIPC, 872 F. Supp. 2d 1 (D.D.C. 2012) ...................................................i, 10

SEC v. SIPC, 842 F. Supp. 2d 321 (D.D.C. 2012) ...............................................20

SEC v. Tome, 638 F. Supp. 596 (S.D.N.Y. 1986)..................................................41

In re Selheimer & Co., 319 B.R. 395 (Bankr. E.D. Pa. 2005).........................10, 29

\*SIPC v. Barbour, 421 U.S. 412 (1975) ........................................2, 6, 7, 8, 31, 43

SIPC v. Bernard L. Madoff Investment Securities, LLC,
  Adv. Pro. No. 08-1789 (BRL) (Bankr. S.D.N.Y. June 10, 2009).......................47

SIPC v. Blinder, Robinson & Co., 962 F.2d 960 (10th Cir. 1992)..........................33

Sniadach v. Family Finance Corporation, 395 U.S. 337 (1969) ............................32

In re Stanford International Bank, Ltd.,
  Case No. 3:09-cv-00271-N (N.D. Tex. July 30, 2012) .......................................48

Thomas Jefferson University v. Shalala, 512 U.S. 504 (1994) ........................56-57

United States v. Broadie, 452 F.3d 875 (D.C. Cir. 2006).......................................24

**CASES (cont.)**

Page

United States v. Hubbard 650 F.2d 293 (D.C. Cir. 1980) .......................................37

United States v. Melrose East Subdivision, 357 F.3d 493 (5th Cir. 2004)..............32

United States v. Long, 328 F.3d 655 (D.C. Cir. 2003)............................................24

**STATUTES AND RULES**

Securities Investor Protection Act of 1970, 15 U.S.C. 78aaa, *et seq.*

Section 2, 15 U.S.C. 78bbb ...........................................................................39
Section 3, 15 U.S.C. 78ccc .............................................................................6
Section 3(a)(1)(A),15 U.S.C. 78ccc(a)(1)(A)..................................................6
Section 3(e)(3), 15 U.S.C. 78ccc(e)(3)............................................................7
Section 4, 15 U.S.C. 78ddd ............................................................................6
Section 5(a)(1), 15 U.S.C. 78eee(a)(1)........................................................8, 32
Section 5(a)(3), 15 U.S.C. 78eee(a)(3) .....................................................6, 8, 35
Section 5(b)(4), 15 U.S.C. 78eee(b)(4) ...........................................................9
Section 5(b)(1), 15 U.S.C. 78eee(b)(1) .....................................................6, 8, 35
Section 5(b)(1)(D), 15 U.S.C. 78eee(b)(1)(D) ...............................................32
Section 5(b)(3), 15 U.S.C. 78eee(b)(3) ...................................................9, 32, 33
Section 5(b)(4), 15 U.S.C. 78eee(b)(4) ......................................................9, 32
Section 5(c), 15 U.S.C. 78eee(c) ......................................................................7
Section 6(a), 15 U.S.C. 78fff(a) ......................................................................9
Section 6(a)(1), 15 U.S.C. 78fff(a)(1) ...........................................................33
Section 8, 15 U.S.C. 78fff-2 ..........................................................................29
Section 8(a)(1), 15 U.S.C. 78fff-2(a)(1) .....................................................9, 33
Section 8(a)(2), 15 U.S.C. 78fff-2(a)(2) ..........................................................9
Section 8a(3), 15 U.S.C. 78fff-2(a)(3) .............................................................9
Section 8(b), 15 U.S.C. 78fff-2(b)........................................................2, 9, 10, 33
Section 9(a), 15 U.S.C. 78fff-3(a) ...............................................................2, 10
Section 9(a)(1), 15 U.S.C. 78fff-3(a)(1)........................................................49
Section 11(a), 15 U.S.C. 78ggg(a) ...................................................................7
Section 11(b), 15 U.S.C. 78ggg(b) ..........................................................1, 3, 7-8, 35
Section 11(c)(1), 15 U.S.C. 78ggg(c)(1) ..........................................................7
Section 16(2)(B)(i), 15 U.S.C. 78lll(2)(B)(i) ...........................................10, 17

**STATUTES AND RULES (Cont.)**

<u>Page</u>

Securities Exchange Act of 2934, 15 U.S.C. 78, *et seq.*

    Section 21(e), 15 U.S.C. 78u(e)............................................................. 21-22

28 U.S.C. 1291 ...................................................................................................4
28 U.S.C. 1331 ...................................................................................................3

**RELEASES**

Net Capital Rule, Release No. 34-31511, 57 F.R. 56973-01 (Dec. 2, 1992) ..........55
Release No. 34-33517, 59 FR 4297-01, 4298 (Jan. 31, 1994) ...............................55
Release No. 34-31512, 57 FR 57027-01 (Dec. 2, 1992) .........................................55
Release No. 34-27249, 54 FR 40395-01 (Oct. 2, 1989) ....................................55-56
Release Nos. 7382 *et al.*, 63 SEC Docket 1671 (Jan. 22, 1997) ...........................55

**MISCELLANEOUS**

H.R. Rep. No. 91-1613 (1970).....................................................................5, 7, 33

S. Rep. No. 91-1218 (1970) ....................................................................5, 6, 7, 33

1-12 Collier on Bankruptcy, P. 12.12 (16th ed.).....................................................23

VII Loss, Seligman & Paredes, SECURITIES REGULATION § 8.B.5
(Wolters Kluwer on-line version 2011) ....................................................................30

Response of the United States Securities and Exchange Commission,
In re New Times Securities Services, Inc., No. 8-00-8178-jbr
(Bankr. E.D.N.Y. filed Nov. 27, 2000)......................................................................56

Letter from Richard G. Ketchum, Director, Division of Market Regulation to
David Marcus, New York Stock Exchange, *et al.* (dated Jan. 14, 1985),
available at http://www.sec.gov/divisions/marketreg/mr-clearing011485.pdf .......56

Securities Investor Protection: Steps Needed to Better Disclose SIPC
Policies to Investors, United States General Accounting Office (May 2001)
[GAO 01-653], available at http://www.gao.gov/new.items/d01653.pdf  ............48

# GLOSSARY

| | |
|---|---|
| SIPA: | Securities Investor Protection Act of 1970 |
| SIPC: | Securities Investor Protection Corporation |
| SGC: | Stanford Group Company |
| SIBL: | Stanford International Bank, Ltd. |
| SIBL CDs: | Stanford International Bank, Ltd., Certificates of Deposit |
| BLMIS: | Bernard L. Madoff Investment Services, LLC |
| FINRA: | Financial Industry Regulatory Authority |
| Op. at # | *SEC v. SIPC*, No. 11-mc-678 (RLW), Memorandum Opinion and Order (filed July 3, 2012) |
| Opp. at # | Securities Investor Protection Corporation's Brief in Opposition to SEC's Application for Order Under 15 U.S.C. § 78ggg(b) |

# PRELIMINARY STATEMENT

Section 11(b) of the Securities Investor Protection Act of 1970, 15 U.S.C. 78aaa, *et seq.* ("SIPA" or the "Act") authorizes the Securities and Exchange Commission ("SEC" or "Commission") to apply to the District Court for the District of Columbia for an order requiring the Securities Investor Protection Corporation ("SIPC") to discharge its statutory obligations in the event SIPC refuses "to commit its funds or otherwise to act for the protection of customers of any member of SIPC." *See* Section 11(b), 15 U.S.C. 78ggg(b).[1]  In this case, which represents the first time since SIPA's enactment that the Commission has utilized its authority under Section 11(b), the Commission sought an order requiring SIPC to file an application to begin a liquidation proceeding for defunct broker-dealer and SIPC member Stanford Group Company ("SGC").

Thousands of SGC customers invested in so-called "certificates of deposit" ("CDs") issued by SGC's off-shore affiliate, Stanford International Bank, Ltd. ("SIBL"), that purportedly were worth billions of dollars.  In reality, however, the group of companies owned or controlled by Robert Allen Stanford, including SGC and SIBL, was operated as a multi-billion-dollar Ponzi scheme centered on the sale

---

[1]     Pertinent statutes are set forth in the Statutory Addendum bound with this brief.

1

of those essentially worthless CDs.  The scheme collapsed in early 2009 and, to date, SIPC has not filed an application to initiate a SIPA liquidation of SGC.

Were such a liquidation initiated, its primary purpose would be to resolve the claims of SGC customers for protection under SIPA.  Investors with potential claims would be provided notice and an opportunity to submit their claims to a SIPC-designated trustee and the ability to challenge the trustee's determinations in federal court.  In addition, if SGC's funds were insufficient to meet the allowed customer claims, a fund maintained by SIPC would be used to supplement the distributions to customers in amounts up to $500,000 per customer, depending upon the nature of their claims.  *See* Sections 8(b) and 9(a), 15 U.S.C. 78fff-2(b), 78fff-3(a).

In refusing to initiate a liquidation, SIPC has taken the position that the Stanford victims are not "customers" of SGC as that term is defined in SIPA.  Rather, in its view, they are depositors of SIBL.  Because SIBL is not a SIPC member, the victims are, in SIPC's view, ineligible for protection under SIPA.  In its role as SIPC's "plenary" supervisor (*SIPC v. Barbour*, 421 U.S. 412, 417 (1975)), however, the Commission determined that some of the Stanford victims appear to meet the definition of "customer" under SIPA, and that SIPC has therefore erred in refusing to act for their protection.

2

In denying the Commission's Section 11(b) application, the district court (1) improperly concluded that the Commission, in seeking to prove that SIPC has refused to act for the protection of customers, must establish its case by a preponderance of the evidence, and (2) relied upon an unduly narrow construction of the term "customer" in deciding whether the Commission had met this burden. Given the preliminary, summary nature of this proceeding, and the Commission's supervisory role, the same probable cause standard applicable to SIPC in initiating a liquidation, rather than the preponderance standard that would apply in the ensuing liquidation, is more appropriately applied. Moreover, in addressing whether the victims are "customers" under SIPA, the district court failed to take into account the unusual nature of the Stanford complex, in which SGC and SIBL were parts of a group of companies that operated as a single fraudulent enterprise that ignored corporate boundaries.

## STATEMENT OF JURISDICTION

The Commission filed its application in the district court under Section 11(b) of SIPA. 15 U.S.C. 78ggg(b). The district court had jurisdiction over the Commission's application under SIPA Section 11(b) and 28 U.S.C. 1331. On July 3, 2012, the district court entered a final order denying the Commission's application, which disposed of all claims in the case. On September 12, 2012, the

Commission timely filed a notice of appeal. This Court has jurisdiction over this appeal under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES PRESENTED

1.      Because claimants in a SIPA liquidation must prove the validity of their claims, including their "customer" status, by a preponderance of the evidence, did the district court err in requiring the Commission to meet that same preponderance standard, rather than a lesser probable cause standard, in this preliminary proceeding to require SIPC to apply to begin such a liquidation?

2.      Did the district court err in interpreting SIPA to exclude investors who, because of the unusual operation of the Stanford companies as a single fraudulent enterprise that ignored corporate boundaries, properly may be deemed to have deposited cash with the debtor broker-dealer, SGC, for the purchase of SIBL CDs?

## STATEMENT OF THE CASE

**A.     Nature of the Case**

On December 12, 2011, the Commission applied under SIPA Section 11(b) for an order requiring SIPC to file an application to begin a SIPA liquidation proceeding for SGC. Such an application by SIPC would be filed in the federal district court for the Northern District of Texas, the court overseeing a receivership of SGC, SIBL, and other Stanford entities ("Receivership Court").

4

Previously, in June 2011, the Commission met and determined, "based on the totality of the facts and circumstances of this case, that SIPC member [SGC] has failed to meet its obligations to customers" and that there are SGC customers in need of the protections provided by SIPA.[2]  The Commission notified SIPC of this formal determination and requested that SIPC apply for a protective decree to begin a liquidation proceeding, but, to date, SIPC has refused to make such an application.

**B.     Relevant Statutory and Regulatory Scheme**

**1.      The Securities Investor Protection Act of 1970**

Congress enacted the Securities Investor Protection Act of 1970 in response to persistent problems in the broker-dealer industry, including the failures of numerous broker-dealers in the late 1960s.  *See* S. Rep. No. 91-1218, at 2-4 (1970) ("Senate Report"); H.R. Rep. No. 91-1613, at 1-2 (1970) ("House Report").  In the years preceding SIPA, "[c]ustomers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings," leading to "disastrous effects on customer assets and investor confidence" and creating the risk of a "domino effect" in which otherwise solvent brokers doing business with

---

[2]     *See* Analysis of Securities Investor Protection Act Coverage for Stanford Group Company ("Commission Analysis" or "Analysis"), attached to letter from Elizabeth M. Murphy, Secretary, Securities and Exchange Commission, to Orlan M. Johnson, Chairman, SIPC (dated June 15, 2011), Declaration of Matthew T. Martens ("Martens First Decl.") Ex. 2.

5

firms that failed also collapsed. *See Barbour*, 421 U.S. at 415. Congress enacted SIPA to prevent these effects, restore investor confidence, and upgrade the financial responsibility requirements for broker-dealers. *See id.* The Act created "a new form of liquidation proceeding, applicable only to member firms, designed to accomplish the completion of open transactions and the speedy return of most customer property." *Barbour*, 421 U.S. at 416.

The Act also created SIPC as a nonprofit, private membership corporation to which most registered brokers and dealers are required to belong and to pay assessments. *See* Sections 3, 4, 15 U.S.C. 78ccc, ddd. Among other functions, SIPC "protect[s] individual investors from financial hardship" and "insulate[s] the economy from the disruption which can follow the failure of major financial institutions." Senate Report at 4. SIPC maintains a fund for customer protection (the "SIPC Fund") financed by the annual assessments on its member broker-dealers, and, where it determines that the Act's requirements are met, may apply in federal district court to begin the liquidation of a SIPC member firm. *See* Sections 5(a)(3), (b)(1), 15 U.S.C. 78eee(a)(3), (b)(1).

Despite its obligations to act for the protection of investors, SIPC is not "'an agency or establishment of the United States Government," Section 3(a)(1)(A), 15 U.S.C. 78ccc(a)(1)(A), and concedes that it "has no regulatory or investigatory role," Letter from Stephen P. Harbeck, President, SIPC to Ralph Janvey, Receiver,

6

Stanford Financial Group, at 1 (dated Aug. 14, 2009), Martens First Decl. Ex. 6 to

Ex. 3 ("SIPC Letter").  Rather, as the *Barbour* Court explained, "Congress has

created a corporate entity to solve a public problem."  Congress therefore also

"provided for substantial supervision of [SIPC's] operations by an agency charged

with protection of the public interest—here the SEC . . . ."  *Barbour*, 421 U.S. at

420.

The Court described the Commission's role under SIPA as one of "plenary

authority" to supervise SIPC's activities.  *Id*. at 417; *see* Senate Report at 1; House

Report at 11-12.  The Commission has plenary control over SIPC's bylaws and

rules (Sections 3(e)(3), 11(a), 15 U.S.C. 78ccc(e)(3), 78ggg(a)), and authority to

inspect and examine SIPC's records and require that any information it deems

appropriate be furnished to it (Section 11(c)(1), 15 U.S.C. 78ggg(c)(1)).  And the

Commission may, on its own motion, file an appearance in any liquidation

proceeding initiated by SIPC and "thereafter participate as a party."  Section 5(c),

15 U.S.C. 78eee(c).

Most importantly here, SIPA also entrusts the Commission with the

exclusive ability to enforce SIPC's obligations under the Act in court.  Section

11(b) of SIPA provides:

> In the event of the refusal of SIPC to commit its funds or otherwise to
> act for the protection of customers of any member of SIPC, the
> Commission may apply to the district court of the United States in
> which the principal office of SIPC is located for an order requiring

7

> SIPC to discharge its obligations under this chapter and for such other relief as the court may deem appropriate to carry out the purposes of this chapter.

Section 11(b), 15 U.S.C. 78ggg(b).  The Supreme Court held in *Barbour* that the Commission is the only party able to seek such relief, as SIPA does not create a private right of action for investors seeking to compel SIPC to apply to begin a liquidation proceeding.  *See* 421 U.S. at 424-25.  As the Court explained, given the consequences of initiating a liquidation, Congress reasonably placed supervision of, and enforcement regarding, SIPC's initial determination as to whether to do so in the hands of the Commission as "an agency experienced in regulation of the securities markets."  *Id.* at 422-23.

### 2.    Liquidations under SIPA

As noted above, one of the primary customer protections provided in SIPA was the creation of a "new form" of liquidation proceeding for member broker-dealers.  SIPC may file an application to begin such a liquidation with an appropriate district court if SIPC "determines that . . . the member . . . has failed or is in danger of failing to meet its obligations to customers" and at least one other factor suggesting financial difficulty exists.  Sections 5(a)(3), (b)(1), 15 U.S.C. 78eee(a)(3), (b)(1).  Because SIPC has no authority to examine its members, it relies on the Commission and self-regulatory organizations for information regarding financially troubled brokers.  *See* Section 5(a)(1), 15 U.S.C. 78eee(a)(1).

8

Upon issuance of a protective decree, the court must appoint a trustee designated by SIPC and order the removal of the entire liquidation proceeding to bankruptcy court.  *See* Section 5(b)(3), (4), 15 U.S.C. 78eee(b)(3), (4).

The purposes of the liquidation proceeding include, "as promptly as possible," delivery or distribution of customer property or other satisfaction of customer claims to the extent provided in the Act.  Section 6(a), 15 U.S.C. 78fff(a). The trustee must provide notice of the proceeding to the public and mail a copy of the notice "to each person who, from the books and records of the debtor, appears to have been a customer of the debtor with an open account within the past twelve months."  Section 8(a)(1), 15 U.S.C. 78fff-2(a)(1).  Customers seeking a return of property must then file with the trustee "a written statement of claim" pursuant to certain statutory deadlines and limitations.  Sections 8(a)(2), (3), 15 U.S.C. 78fff-2(a)(2), (3).  The trustee makes initial claims determinations under a process approved by the bankruptcy court, and claimants can challenge those determinations in the bankruptcy court (the decisions of which can then be appealed to the relevant district court and federal appellate courts).

In reviewing claims, the trustee "shall promptly discharge" the broker-dealer's obligations to its customers pursuant to SIPA's requirements.  Section 8(b), 15 U.S.C. 78fff-2(b).  SIPA defines the term "customer" to include, as relevant here, "any person who has deposited cash with the debtor for the purpose

9

of purchasing securities."  Section 16(2)(B)(i), 15 U.S.C. 78lll(2)(B)(i).  In the

liquidation proceeding, claimants bear the burden of establishing their "customer"

status and the validity of their claims by a preponderance of the evidence.  *See In*

*re Selheimer & Co.*, 319 B.R. 395, 404 (Bankr. E.D. Pa. 2005).  If funds available

at the broker-dealer are insufficient to satisfy customers' allowed claims, the SIPC

Fund is used to supplement the distribution, up to a maximum of $500,000 per

customer for claims for securities.  *See* Sections 8(b), 9(a), 15 U.S.C. 78fff-2(b),

fff-3(a).

## C.    Statement of the Facts

SGC is a SEC-registered, Houston-based broker-dealer that was wholly

owned (indirectly) and controlled by Allen Stanford, but is now in receivership.

Martens Third Decl. Ex. 5 at ¶ 2; Stipulated Facts ¶ 1. [3]  SGC is a SIPC member.

Stipulated Facts ¶ 1.  Allen Stanford also was the sole owner (indirectly) and

chairman of the board of SIBL, a private international bank organized under the

laws of Antigua, which is not a SIPC member.  Stipulated Facts ¶¶ 2, 7; Martens

Third Decl. Ex. 2 at ¶ 9, Ex. 6 at 3149, ll. 19-21.  SGC operated through numerous

---

[3]    The district court requested that the parties "attempt to reach agreement on
as many facts as possible," (Memorandum Opinion and Order at 9 (filed July 3,
2012) ("July 3 Order" or "Op.") (*SEC v. SIPC*, 872 F. Supp. 2d 1 (D.D.C. 2012))
and the parties were able to stipulate to several undisputed facts.  The relevant
stipulated facts and other facts supported by the record are set forth here.

offices located throughout the United States, and its principal business was the sale of securities issued by SIBL marketed as "certificates of deposit" ("CDs" or "SIBL CDs").  Martens Third Decl. Ex. 6 at 3148-49.  The entire Stanford enterprise, including SIBL and SGC, however, operated as a massive, unified Ponzi scheme centered on the sale of SIBL CDs.  Martens Third Decl. Ex. 1 at 5-6, Ex. 2 at ¶¶ 8-28, Ex. 5 at ¶ 5; *see Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 793 F. Supp. 2d 825, 828, 856-57 (N.D. Tex. 2011).

In February 2009, the Commission filed a civil law enforcement action in the U.S. District Court for the Northern District of Texas against Allen Stanford, SGC, SIBL, and others based upon the Ponzi scheme.  *See* Analysis, attach. 1 (Second Amended Complaint).  On the same day the Commission filed suit, the court appointed a receiver ("Receiver") for the defendants' assets and records. Martens Third Decl. Ex. 2 at ¶ 4.  The Receiver and his forensic accountant have conducted extensive investigations and analyses of the Stanford records and have summarized them in various reports to the court, declarations, and testimony.

The Receiver's materials conclude that:  SGC and SIBL were two entities within "a complex, sprawling web of more than 100 companies, all of which were controlled and directly or indirectly owned by Allen Stanford."  Analysis, attach. 2, at 5 (Report of the Receiver Dated Apr. 23, 2009) ("Receiver's Report").  "The companies were operated in a highly interconnected fashion" to advance the selling

11

of SIBL CDs. *Id.* The entities did not have a typical management hierarchy or governance structure, and the actual structure appears to have been designed to obfuscate holdings and transfers of cash and assets. *Id.* at 6. SIBL, SGC, and other Stanford entities operated under the brand name "Stanford Financial Group" to lend credibility to SIBL and portray it as part of a larger group of companies headquartered in Houston, Texas. Martens Third Decl. Ex. 1 at 36, Ex. 3 (Affidavit of Michael A. Kogutt) at ¶¶ 7, 17 ("Kogutt Aff."); Analysis, attach. 5 at ¶ 5 (Affidavit of Sally Matthews) ("Matthews Aff."). Corporate separateness was not respected within the Stanford group of entities, and "money was transferred from entity to entity as needed," irrespective of legitimate business purposes. Receiver's Response to the Antiguan Liquidators' December 3 Supplemental Brief at 3-4, *In re Stanford Int'l Bank Ltd.*, Case No. 3:09-cv-00721-N (N.D. Tex. filed Dec. 17, 2009), Analysis, attach. 3 ("Dec. 17 Response").

The Receiver determined that, at the time of the scheme's collapse, approximately $7.2 billion of SIBL CDs were outstanding and held by thousands of public investors worldwide, including investors in the United States. Receiver's Report at 12; Martens Third Decl. Ex. 2 at ¶ 18. SIBL CD purchasers in the United States dealt substantially, if not exclusively, with SGC salesmen. Dec. 17 Response at 6; Matthews Aff. ¶ 5; Kogutt Aff. ¶¶ 16-19. SGC salesmen promoted

12

the CDs to investors,[4] and investors opened brokerage accounts at SGC (Kogutt Aff. ¶ 9; Martens First Decl. Ex. 3 to Ex. 3), and accounts at SIBL in order to purchase them (Stipulated Facts ¶ 3). Most CD purchasers never saw a SIBL employee, and instead dealt only with their SGC salesman, who, to them, was the face of the Stanford companies, including SIBL. Dec. 17 Response at 6; Martens Third Decl. Ex. 1 at 32-33; Matthews Aff. ¶ 5; Kogutt Aff. ¶¶ 16-19. SGC's salesmen used the apparent legitimacy offered by U.S. regulation of SGC in order to generate sales of SIBL CDs. Receiver's Report at 7.

When opening SGC accounts, many customers entered into an Account Application and Agreement. Martens First Decl. Ex. 3 to Ex. 3. The agreement includes the Stanford eagle logo used for both SGC and SIBL and contains language on the first page indicating that customers were entering into an Agreement with SGC, an NASD/Financial Industry Regulatory Authority ("FINRA") and SIPC member. *Id.* SIBL CD investors received periodic statements from SIBL reflecting the balances in their SIBL accounts, including their CD balances. Stipulated Facts ¶ 5. At least some CD purchasers also received account-related statements from SGC that showed their CD balances,

---

[4]    As an "introducing broker," SGC's salesmen could and did promote investment products, including SIBL CDs, to customers. An introducing broker, however, typically refers clearing of trades to a third-party brokerage firm with which it contracts, referred to as a "clearing firm."

13

were emblazoned with the Stanford logo across the top of the page, and indicated that SGC was an NASD or FINRA member and a member of SIPC. Martens Third Decl. Ex. 5 at ¶¶ 6, 8 & Ex. A. *See also* Martens Third Decl. Exs. A & I to Ex. 4.

Disclosure statements for SIBL CDs stated that "SIBL's products are not subject to the reporting requirements of any jurisdiction, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation." Stipulated Facts ¶ 6. At least some customers were nevertheless told by SGC salesmen that the SIBL CDs were covered by SIPC. *See* Kogutt Aff. at ¶¶ 5-6; Matthews Aff. ¶ 7. *See also* Martens First Decl. Ex. 1 at 2, Ex. C to Ex. 1. For the purposes of this case, all SGC investors either received the physical CD certificates or had them held by an authorized designee. Stipulated Facts ¶ 4.

SGC clients took direction from SGC personnel with regard to the transmission of their funds for the purchase of SIBL CDs. Kogutt Aff. ¶¶ 10-12, 14, 15; Matthews Aff. ¶ 3; s*ee* Martens First Decl. Ex. 5 to Ex. 3, at ¶¶ 4, 8-10. Investors in CDs wrote checks that were deposited into SIBL accounts and/or filled out or authorized wire transfer requests asking that money be wired to SIBL for the purpose of opening their accounts at SIBL and purchasing CDs. Stipulated Facts ¶ 3; Opp. Exs. 12, 13. Although initially deposited into SIBL bank accounts in the U.S. and Canada, investors' funds were then diverted to the various Stanford

14

entities, including SGC.  Martens Third Decl. Ex. 1 at 6-7, 29-32, Ex. 6 at 3148, l.

25 - 3149, l. 13; 3161; Kogutt Aff. ¶ 22; Receiver's Report at 6-9; Analysis, attach.

4 at ¶¶ 47-54 (Declaration of Karyl Van Tassel) ("Van Tassel Decl.").  SIBL

employees in Antigua, including even its president, had essentially no control over

the proceeds of CD sales or the bank's financial reporting, and indeed, SIBL's

president was not even on the bank's payroll.  Martens Third Decl. Ex. 1 at 6, 9,

16-17, 19, 25-28; Dec. 17 Response at 7-10.

     Proceeds from SIBL CD sales variously were diverted for Stanford's

personal use, disbursed to Stanford-controlled entities (including SGC), used to

purchase private equity and other investments, and used to pay CD redemptions

and interest.  *See* Receiver's Report at 7.  During the five-year period from 2004

through 2008, approximately $628 million in investor funds were diverted back to

SGC.  Martens Third Decl. Ex. 2 at ¶¶ 26-28.  At SGC, the funds were used to

support SGC's operations and to compensate its personnel, who were highly

incentivized to sell CDs.  Receiver's Report at 6-9; Van Tassel Decl. ¶¶ 47-54;

Martens Third Decl. Ex. 2 at ¶ 17.  SGC could not have stayed afloat without the

influx of misappropriated investor funds.  Martens Third Decl. Ex. 2 at ¶¶ 26-28.

**D.     Course of Proceedings**

**1.     SIPC's Customer Need Determination**

After early 2009, Commission staff and senior SIPC personnel were in regular contact regarding the SGC matter.  *See* SIPC Letter at p.1.  As the Commission received evidence from victims regarding their claims for SIPA coverage, the Commission promptly forwarded that information to SIPC.  SIPC also had access to the public filings of the Receiver and his forensic accountant in the Receivership Court.  In addition, SIPC has requested and obtained information from the Receiver directly.  *See* Tr. 65, ll. 6-8, Mar. 5, 2012.

In August 2009, in response to a letter from the Receiver (Martens First Decl. Ex 6 to Ex. 3), SIPC's President sent a letter denying any basis for SIPA coverage (SIPC Letter at 3).  In SIPC's view, the Stanford victims who dealt with SGC are not "customers" under SIPA because SGC "is not, nor should it be, holding anything for [them]" in its custodial function; their "cash was sent to SIBL" and they "have their securities—the CDs themselves."  *Id.* at 3.  SIPC further stated that the result would not change "if SGC and SIBL are [substantively] consolidated," and therefore treated as a single entity, because, in

16

that event, the SIBL "CDs are, in effect, debts of SGC, and are part of the capital of SGC," thereby negating "customer" status.[5]  *Id.*

### 2.    The Commission's Customer Need Determination and Formal Request to SIPC

On June 15, 2011, the Commission met and determined that, contrary to SIPC's view, there are SGC customers in need of protection under SIPA and formally requested SIPC's Board of Directors to take the necessary steps to institute a SIPA liquidation proceeding of SGC.  *See* Murphy Letter, Martens First Decl. Ex. 2.  The Commission supplied SIPC with the analysis of SIPA coverage underlying its formal determination.  *See generally* Analysis.  In this analysis, the Commission interpreted SIPA's "customer" definition as encompassing SGC accountholders who purchased SIBL CDs through SGC based on the portion of the definition covering "any person who has deposited cash with the debtor for the purpose of purchasing securities."  Section 16(2)(B)(i), 15 U.S.C. 78lll(2)(B)(i); *see* Analysis at 7-12.

The Commission concluded that in this case the facts suggested that the separate corporate forms of SGC and SIBL should be disregarded and that "depositing money with SIBL was, for SGC accountholders, in reality no different than depositing it with SGC."  *Id.* at 8-9.  The Commission reasoned that to

---

[5]     As explained below, *infra* at pp. 47-49, substantive consolidation is an equitable bankruptcy law doctrine allowing the disregard of corporate form.

17

conclude otherwise "on the facts of this case would elevate form over substance by honoring a corporate structure designed by Stanford in order to perpetrate an egregious fraud." *Id.* at 10-11.

The Commission also noted two court of appeals cases, *In re Old Naples Securities, Inc.*, 223 F.3d 1296 (11th Cir. 2000) and *In re Primeline Securities Corp.*, 295 F.3d 1100 (10th Cir. 2002), that have taken a similar approach.  The Commission explained that those decisions hold that an investor, in certain circumstances, may be deemed to have deposited cash with a broker-dealer for the purpose of purchasing securities—and thus be a "customer" under SIPA—even if the investor initially deposited those funds with an entity other than the broker-dealer.  *Id.* at 7-8.  The Commission concluded that, here SGC accountholders who purchased through SGC should be deemed to have deposited money with SGC because the Stanford entities were operated in a highly interconnected fashion, facts could have led SGC accountholders to believe they were depositing money with SGC, and misappropriated investor funds were diverted to pay SGC's expenses and for SGC's sole owner's personal use.  *See id.* at 8-10.

Finally, the Commission determined that such a customer's claim should be valued not based on the value of the fraudulent CDs that Stanford used to carry out his scheme but based on the customer's net investment in SIBL CDs.  Analysis at 12-14.  As the Commission explained, where, as here, the purported securities are

18

in fact fraudulent instruments used to perpetrate a Ponzi scheme, the issuance of those instruments (here, the SIBL CDs) should be disregarded. *Id.* at 14. This approach is consistent with the approach taken in SIPA cases involving Ponzi schemes where courts have used the net investment measurement so as not to give effect to fraudulent securities positions or fictitious profits reported by the fraudster to perpetuate his scheme. Analysis at 12-14 (citing *In re Old Naples Secs., Inc.*, 311 B.R. 607, 615-17 (M.D. Fla. 2002); *In re Bernard L. Madoff Inv. Secs., LLC ("BLMIS")*, 424 B.R. 122, 140 n.35 (Bankr. S.D.N.Y. 2010); *In re C.J. Wright & Co., Inc.*, 162 B.R. 597, 610 (Bankr. M.D. Fla. 1993)).[6] The Commission reasoned that, because customer claims are most appropriately valued based on the net investment measurement, the fact that CD investors received their fraudulent CDs did not prevent them from qualifying for protected "customer" status. Analysis at 7, 12-14.

SIPC refused to take the necessary steps to institute a liquidation proceeding of SGC as requested by the Commission, *see* Martens First Decl. ¶¶ 8-9, and the Commission filed an application for a court order to require SIPC to act.

---

[6]    The bankruptcy court's decision in the *BLMIS* (Madoff) case has since been affirmed based on the same reasoning by the Second Circuit. *See In re BLMIS*, 654 F.3d 229, 237-242 (2d Cir. 2011), *cert. denied*, 133 S.Ct. 24, 25 (2012).

### 3.     Proceedings in the District Court

#### a.     The Commission's Section 11(b) Application

On December 12, 2011, the Commission filed its application in the U.S.

District Court for the District of Columbia under SIPA Section 11(b), seeking an

order requiring SIPC to apply to begin a SIPA liquidation proceeding for SGC.

The Commission initiated the lawsuit by requesting an order directing SIPC to

show cause why the Commission's application should not be granted.  SIPC

challenged the Commission's commencement of the proceeding in this summary

manner, arguing that the dispute should be resolved by way of a plenary

proceeding under all of the Federal Rules of Civil Procedure, with all of the

attendant procedural steps.

#### b.     February 9 Order as to the Nature of the Proceeding and Scope of Review

On February 9, 2011, the district court issued a decision agreeing with the

Commission that Congress intended a Section 11(b) application to be resolved in a

summary proceeding and granting the Commission's motion for an order to show

cause.  Memorandum Opinion and Order, at 7-10 (filed Feb. 9, 2012) ("February 9

Order") (*SEC v. SIPC*, 842 F. Supp. 2d 321 (D.D.C. 2012).  The court also decided

it would make a determination *de novo* as to whether the Stanford victims are

"customers" under SIPA rather than leaving that question for resolution by the

Receivership Court.  *Id.* at 11.  The court did not determine what standard of proof

20

would be required of the Commission in proving customer status, expressly

leaving that issue, among others, for further briefing.  *Id.* at 13.  The court

recognized, however, that its resolution of these questions should take into

consideration the fact that "this proceeding will only determine whether SIPC

should be compelled to file an application for a protective decree in the Texas

federal court," leaving for that court to determine whether the decree should be

granted and, ultimately, whether SIPC is liable for any claims.  *Id.*  After additional

briefing and a hearing, on July 3 the court issued an order denying the

Commission's Application.  Op. at 18.

> ### c.     July 3 Order as to the Standard of Proof and SIPA's "Customer" Definition

In its July 3 Order, the district court addressed two principal issues:  the

standard of proof applicable to the Commission's application and the proper

interpretation of SIPA's "customer" definition.

First, the district court, rejecting the Commission's argument that a probable

cause standard is appropriate in this preliminary proceeding, held that a

preponderance standard applies to the Commission's application.  In doing so, it

relied primarily on an analogy to Section 21(e) of the Securities Exchange Act of

1934 ("Exchange Act"), which authorizes the Commission to file an "application"

for an "order" that "command[s]" a person or entity "to comply" with the

Exchange Act and regulations thereunder.  Exchange Act Section 21(e), 15 U.S.C.

78u(e).  The court believed that a Section 21(e) application resembles a Section 11(b) application, and that the case law under Section 21(e), which uses a preponderance standard, should apply here because Section 2 of SIPA states that, except as otherwise provided, the provisions of the Exchange Act should apply to SIPA as if SIPA were an amendment to that Act.  *See* Op. at 4-6.  The court further relied on what it termed a "preference for the preponderance standard in civil litigation generally."  Op. at 6 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387-91 (1983)).  Finally, the court stated that it is "mindful that SIPC, a corporate body, is entitled to due process in the present proceeding, even if the SEC is considered its plenary supervisor under the SIPA statutory scheme."  Op. at 6.  The court did not hold that a preponderance standard is required by the Due Process Clause, or find that the use of a lesser standard would raise constitutional questions.  *See* Op. at 6.

The Commission had argued (*see* Op. at 6 n.4) that because claimants in a subsequent liquidation proceeding would be required to show, by a preponderance of the evidence, that they are "customers" under SIPA, the standard for initiating that proceeding should be the lesser probable cause standard that SIPC itself uses. The court reasoned, however, that SIPC already "has reviewed the matter and determined that there are no customers who 'may' need protection under SIPA . . . ."  Op. at 6 n.4.  The court believed that "it is fitting that Congress wanted the

22

SEC to meet a higher burden to overturn the conclusion of the SIPC (who has the authority in the first instance to make the determination)."  Op. at 6 n.4.

Second, in addressing the Commission's view of customer status, the district court focused on what it viewed to be the plain meaning of the term "deposited" in SIPA's definition of "customer."  The court relied on authority stating that the critical aspect of the "customer" definition is the "entrustment of cash or securities to the broker-dealer."  Op. at 8-9.  To prove "entrustment," the court reasoned, a claimant "must prove that the SIPC member actually possessed the claimant's funds or securities."  Op. at 9 (citing 1-12 Collier on Bankruptcy, P. 12.12 (16th ed.)).  The court explained that, in its view, to broaden the scope of customer status beyond individuals for whom the broker-dealer actually possessed funds or securities would be improper because "courts have consistently held that the 'customer' definition should be construed narrowly."  Op. at 16 (citing cases).

Given its interpretation of the customer definition, the district court concluded that the Commission failed to meet its burden under a preponderance standard.  Based on the court's reading of the stipulated facts, it concluded that the Commission "cannot show that SGC ever physically possessed the investors' funds at the time that the investors made their purchases."  Op. at 11.  The court observed that the "investors' checks were not made out to SGC and were never deposited into an account belonging to SGC."  Op. at 11.  The court stated that it was not

"swayed" by the Commission's argument that some of the CD sales proceeds were used to pay expenses of SGC, nor that some of the investors were told that the CDs were protected by SIPA.  Op. at 17.  The court concluded that "[t]hose assertions, even if true, run too far afield from the key issue, which is whether the investor entrusted cash to SGC for the purpose of effecting a securities transaction."  Op. at 17.  The court held, alternatively that "because the issue turns on uncontested facts and an interpretation of law," the Commission also failed to meet the lower probable cause standard.  Op. at 17.

## STANDARD OF REVIEW

The issues presented here all are issues of law which this Court reviews *de novo*:  issues as to the interpretation of SIPA, *see, e.g.*, *In re BLMIS*, 654 F.3d 229, 234 (2d Cir. 2011), *cert. denied*, 133 S.Ct. 24, 25 (2012); the applicable standard of proof, *see, e.g.*, *United States v. Long*, 328 F.3d 655, 669 (D.C. Cir. 2003); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 547-49 (6th Cir. 1999); and whether the applicable standard of proof has been met, *see, e.g.*, *United States v. Broadie*, 452 F.3d 875, 879 (D.C. Cir. 2006).

24

## SUMMARY OF ARGUMENT

In denying the Commission's application, the district court made two reversible errors:

*First*, it incorrectly applied a heightened preponderance standard of proof to the Commission's application rather than the more appropriate probable cause standard. Congress created in SIPA a specific process, within the context of a SIPA liquidation, in which investors must prove their claims for coverage under the Act, including their "customer" status, by a preponderance of the evidence. It makes no sense to apply the same standard to the Commission in proving "customer" status on behalf of investors in this preliminary, summary proceeding.

Moreover, Congress's overarching goals of promoting investor confidence in the securities markets by providing speedy relief for investors indicate that a lesser standard of proof should apply to the initial question of whether SIPC should initiate a liquidation. Indeed, perhaps in recognition of this, SIPC itself is held to a lesser standard when it applies to begin a liquidation. The district court was therefore incorrect in applying a higher standard of proof to the Commission, which is SIPC's plenary supervisor.

The district court's error in this regard was based upon the mistaken belief that the application of the provisions of the Exchange Act to SIPA shows a congressional intent to apply the preponderance standard. But there is no sound

25

basis to analogize plenary proceedings under Exchange Act Section 21(e)—used to finally determine whether a permanent injunction should be granted—to this preliminary, summary proceeding used to determine whether SIPC should be required to apply to begin a liquidation proceeding.

*Second*, the district court incorrectly interpreted SIPA's customer definition to exclude investors who, because of the unusual operation of the Stanford companies, should be deemed to have deposited cash with SGC. The record here provides at least probable cause to believe that the purported legal separateness of SGC and SIBL should be disregarded, such that, by depositing cash with SIBL, SGC accountholders who purchased SIBL CDs through SGC were effectively depositing cash with SGC. Courts facing similar circumstances have disregarded the corporate separateness of SIPC members and non-member affiliated companies, with SIPC's support. The district court's contrary approach improperly elevates form over substance by strictly adhering to the corporate boundaries of the Stanford entities which were designed to perpetrate an egregious fraud.

Even apart from the lack of genuine separateness of the corporate entities, SIPA's "customer" definition includes those who can be deemed to have deposited cash with a broker-dealer under the *Old Naples* and *Primeline* cases. Those cases rejected the notion that "customer" status requires that cash be deposited directly

26

with the broker-dealer, and held that investors in certain circumstances fell within the "customer" definition. Those cases are materially indistinguishable from this one, and the district court's belief otherwise was based on a misunderstanding both of those cases and of the record here.

Finally, the Commission's interpretation of SIPA's "customer" definition is the correct one and is, at the very least, a reasonable one entitled to deference under *Chevron*. The district court declined to give such deference because it perceived an inconsistency between the interpretation and certain past statements of the Commission. The Commission's past statements, however, clearly state only a general presumption and are fully consistent with the Commission's interpretation in this matter.

27

## ARGUMENT

**I.    The probable cause standard applicable when SIPC itself seeks to initiate a SIPA liquidation should likewise be applied to the Commission, as SIPC's plenary supervisor, in this preliminary, summary proceeding.**

The text, structure, and legislative history of SIPA all support using a probable cause standard here.  As the district court recognized, this is a summary proceeding, in which the only question is "whether SIPC should be compelled to file an application for a protective decree in the Texas federal court."  February 9 Order at 13.  Whether any of investors can prove the validity of their claims, including "customer" status, by the higher preponderance standard would be decided in a later liquidation proceeding.  The application of that same preponderance standard in a Section 11(b) proceeding would not only be duplicative of later proceedings in the bankruptcy court, but it would also hold the Commission, which has inferior access to the necessary facts, to the same standard as claimants who are better situated to litigate their customer status.

Perhaps for these reasons, SIPC itself may apply in court to trigger the protections of SIPA based on a probable cause standard, and courts have granted SIPC's applications based on that standard.  Given the Commission's role under the statute as SIPC's plenary supervisor, this same probable cause standard should apply here.  The district court's decision to the contrary failed to give due weight

28

to the nature of this special relationship between the Commission and SIPC and

incorrectly analogized to fundamentally different provisions of the securities laws.

> **A.    Congress intended the procedural protections of SIPA to be available where there is probable cause to believe that there are customers in need of protection.**

>> **1.    It is inconsistent with SIPA to require a heightened standard of proof prior to the initiation of a liquidation.**

SIPA provides substantive protections for broker-dealer customers in the

form of the satisfaction of valid customer claims.  But just as important to the

regulatory scheme Congress enacted are the procedural protections provided,

within the context of a SIPA liquidation proceeding, by which potential customers'

claims against the estate of a broker-dealer can be resolved as expeditiously as

possible, with an opportunity for judicial review thereof.  *See* Section 8, 15 U.S.C.

78fff-2.

In creating this specialized liquidation process, Congress provided a specific

procedural mechanism for adjudicating the ultimate question of whether a

particular claimant is entitled to coverage under the Act.  And, as a part of that

process, customers bear the burden of proving their claims, including "customer"

status, by a preponderance of the evidence.  *See In re Selheimer & Co.*, 319 B.R. at

404.  It would make no sense for this mechanism to be triggered only where

eligibility to advance customer claims is established by SIPC or the Commission

under that same preponderance standard from the outset.

29

In addition to being duplicative of the claims process contemplated once a liquidation is instituted, application of a preponderance standard prior to the institution of a liquidation would require a third party—be it SIPC in its own application or the Commission in a Section 11(b) proceeding—to prove an investor's eligibility without the investor's familiarity with, or degree of access to, the particular facts. A potential customer's entitlement to coverage under SIPA can be a fact-intensive inquiry. There is often discovery and claimants can and do file objections to adverse decisions by the trustee with the bankruptcy court, the decisions of which may then be appealed. *See, e.g., New Times*, 371 F.3d 68, 74-75 (2d Cir. 2004) (describing claimants' objections to trustee's determination); *In re Old Naples Secs., Inc.*, 223 F.3d 1296, 1301 (11th Cir. 2000) (describing appeal process); VII Loss, Seligman & Paredes, SECURITIES REGULATION § 8.B.5 at n.473 (Wolters Kluwer on-line version 2011) (collecting cases). Thus, the claimants themselves, who have the best access to the underlying facts, are in the best position to litigate these questions.

Moreover, if the eligibility to advance customer claims must be proven by a preponderance of the evidence before all investors with potential claims are sent formal notice at the outset of a liquidation, there is a possibility that some customer scenarios will be overlooked. This risk is exacerbated by the fact that should SIPC or the Commission, without equal access to the facts, fail sufficiently to prove that

30

a liquidation should be instituted, all customers are left without recourse. *Barbour*, 421 U.S. at 425 (customers of a member broker-dealer cannot sue to compel SIPC to perform its statutory obligations). And, while there are strong systemic reasons for leaving the determination of whether to initiate a liquidation to SIPC, under the supervision of the Commission, rather than customers (*Id*. at 422-23), it would be inconsistent with SIPA's customer-protection intent to apply a heightened burden of proof in this situation.

Finally, the use of a probable cause standard at this stage is consistent with longstanding precedent holding, in both civil and criminal contexts, that probable cause is an appropriate standard in preliminary proceedings such as this that do not lead to a definitive resolution of the merits of the underlying claim. *See, e.g., Bell v. Burson*, 402 U.S. 535, 542 (1971) (suspension of the driver's license in an administrative proceeding required proof of a "reasonable possibility" that the driver would be found liable on the merits in a subsequent lawsuit);[7] *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975) (criminal defendant may be detained pending trial on the merits based on a probable cause finding by a judicial officer).[8]

---

[7]    The Supreme Court has since explained that the "reasonable possibility" standard articulated in *Bell* is the "probable cause" standard of proof. *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).

[8]    *See also C.I.R. v. Shapiro*, 424 U.S. 614, 629 (1976) (explaining that, pending final adjudication, due process requires predeprivation hearing at which

31

**2.**    **SIPA's overarching goal of speedy relief for investors supports the use of the more expeditious probable cause standard.**

To require more than a probable cause showing by the Commission to compel SIPC to apply to begin a liquidation proceeding would also undermine SIPA's overarching goal of speedy relief for investors.

Under the statute, the Commission or a self-regulatory organization notifies SIPC "immediately" if it believes a broker-dealer is in or approaching financial difficulty.  Section 5(a)(1), 15 U.S.C. 78eee(a)(1).  Section 5 of SIPA mandates that applications to begin a liquidation generally be heard within *three days* of filing and that the court issue a protective decree "forthwith" if the necessary statutory elements are satisfied.  Section 5(b)(1)(D), 15 U.S.C. 78eee(b)(1)(D). After a district court issues a protective decree, it must appoint a trustee and remove the proceeding to bankruptcy court "forthwith."  Sections 5(b)(3), (4), 15 U.S.C. 78eee(b)(3), (4).  The Act also precludes potentially time-consuming

---

(Footnote Cont.)

showing of the *probable validity* of the deprivation must be made); *Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 343 (1969) (Harlan, J., concurring) (explaining that due process can be satisfied by a prejudgment hearing aimed at establishing at least the *probable validity* of the underlying claim against an alleged debtor); *United States v. Melrose East Subdivision*, 357 F.3d 493, 498-505 (5th Cir. 2004) (civil forfeiture proceeding); *Lucas v. Wisconsin Elec. Power Co.*, 466 F.2d 638, 650-51 (7th Cir. 1972) (en banc) (Stevens, J.) (holding that, for a preliminary and tentative determination, due process is satisfied by a showing that there is a "*reasonable possibility* of judgments in the amounts claimed"") (emphasis added).

litigation regarding the appointment of the trustee by requiring the appointment of SIPC's designee.  Section 5(b)(3), 15 U.S.C. 78eee(b)(3); *see SIPC v. Blinder, Robinson & Co.*, 962 F.2d 960, 964 (10th Cir. 1992).

In addition, SIPA states that the first purpose of a liquidation proceeding is, "as promptly as possible after the appointment of a trustee in such liquidation proceeding," the appropriate delivery or distribution of customer securities or property or other satisfaction of net equity claims of customers.  Section 6(a)(1), 15 U.S.C. 78fff(a)(1).  Consistent with this purpose, SIPA requires the trustee to issue notice of the liquidation proceeding and to discharge all of the debtor's obligations to customers "promptly."  Sections 8(a)(1), (b), 15 U.S.C. 79fff-2(a)(1), (b).

SIPA's legislative history likewise repeatedly emphasizes the goal of prompt investor protection.  The drafters stated that the allowance of SIPC fund advances to the trustee is a "significant provision [that] will make it possible for public customers to receive promptly that to which they are entitled without the delay entailed in waiting for the liquidation proceeding to be completed."  House Report at 8; *see* Senate Report at 11 (noting customers' interest in the distribution of securities held for their account "as rapidly as possible").  This overarching goal of rapid action to protect investors is incompatible with the use of a heightened standard of proof at this preliminary stage and the more full-blown litigation it likely would entail.

33

### 3.    SIPC is held only to a probable cause standard when it applies to initiate a liquidation.

Perhaps in recognition of principles discussed above, courts have not held SIPC to a preponderance of the evidence standard when it applies to institute a liquidation.

In *SEC v. Alan F. Hughes, Inc.*, 461 F.2d 974, 982 (2d Cir. 1972), the court held that a liquidation proceeding could begin over the objection of the broker-dealer because "more than a reasonable showing" of customer need had been made. 461 F.2d at 982. In so doing, the court emphasized that SIPA authorizes SIPC to apply to begin a liquidation not only where a broker-dealer has failed to meet its obligations to customers, but also where there is merely a "danger" of that circumstance. *Id.* at 979-82. The court accordingly held that, in order to grant a SIPC application for a protective decree, SIPC need "only to show that there [is] a danger that [the broker-dealer] would fail to meet its obligations, not that it had actually done so . . . ." *Id.* at 982.

Moreover, SIPC has a longstanding practice of filing conclusory applications to begin liquidation proceedings, which have been routinely granted by courts, indicating the applicability of a lesser standard such as probable cause. To initiate most liquidation proceedings, SIPC files a boilerplate application that simply states that, upon sufficient information, including information supplied by the Commission or a self-regulatory organization, SIPC has determined that the

34

member has failed to meet its obligations to its customers within the meaning of Section 5(a)(3), 15 U.S.C. 78eee(a)(3).[9]  The supporting memorandum of law that SIPC typically files provides a similar summary statement.  *See id.*  Indeed, in none of the fifteen customer protection proceedings that SIPC has applied to begin from 1998 through 2010, and for which records are readily available, has SIPC provided the court with a detailed factual basis for its determination that a member had failed or was in danger of failing to meeting its obligations to customers.  *See id.* Moreover, in most or all of these cases it appears that the district courts routinely granted SIPC's applications.  *See id.*[10]

   Nor is a definitive showing that there are "customers" necessarily required at the outset.  SIPC has exercised its authority to apply to invoke the procedural

---

[9]    *See* Martens First Decl. ¶¶ 4, 5 & Ex. 4.  Exhibit 4 provides the initial SIPC filings and court orders for 15 SIPC customer protection proceedings since 1998 and were identified from the approximately 66 proceedings listed in the appendices to SIPC's annual reports from 1998-2010, available on SIPC's website at http://www.sipc.org/who/annualreports.aspx (last accessed Jan. 9, 2013), or from publicly available news reports.  This tally does not include "direct payment" proceedings under the Act where claims are addressed without initiating a SIPA liquidation.  SIPC's filings in the listed proceedings other than these 15 appear not to be available through commercial electronic databases.  *See* Martens First Decl. ¶ 5.

[10]    We note that SIPC is not required to act where, although the probable cause standard is met, the Commission does not object to SIPC's inaction.  Both SIPC's authority to apply to begin a proceeding and the Commission's Section 11(b) authority are granted in permissive terms.  *See* Sections 5(a)(3), (b)(1), Section 11(b), 15 U.S.C. 78eee(a)(3), (b)(1), 78ggg(b).

protections of SIPA where it determined only that there "*may be* 'customers.'"
*C.J. Wright, Inc.*, No. 5:91 cv 92 (M.D. Fla.), Martens Second Decl. Ex.1, at 3-4 &
12 (emphasis added) (application to begin a liquidation proceeding alleged that the
broker-dealer "ha[d] failed to meet its obligations to persons who *may be*
'customers' within the meaning of . . . SIPA," and that "there *may be* customers of
the Defendant broker-dealer in need of the protection provided by SIPA.").[11]

> **B.     Given the Commission's role as SIPC's plenary supervisor, the
>          same probable cause standard should govern Commission
>          applications to require SIPC to seek to initiate a liquidation.**

Because SIPC is held to a probable cause standard when it applies to begin a
liquidation, it follows that the Commission should not be held to a higher
preponderance standard in a Section 11(b) proceeding.

First, all of the same reasons that make it appropriate to use a probable cause
standard for SIPC apply equally here.  Like SIPC's applications, Section 11(b)
proceedings are preliminary in nature and will not lead to the ultimate
determination of investor eligibility to make a claim.  And, as with SIPC, claimants
themselves are in a better position to advocate the particulars of their individual
claims than the Commission.

---

[11]     The district court below, by noting that "SIPC has reviewed the matter and
made the determination that there are no customers who 'may' need protection
under SIPA," appears to have recognized that something less than a preponderance
standard applies to SIPC's determination of whether to begin a liquidation
proceeding.  Op. at 6 n.4.

Second, just as Congress intended SIPA liquidations to provide customers with prompt relief, it intended enforcement proceedings under Section 11(b) to be summary ones. As the district court correctly held, in enacting Section 11(b), Congress did not intend "a lengthy, full-blown plenary proceeding" at this stage. Op. at 9. This is especially the case given that, as the district court noted, later proceedings will determine "whether SIPC is liable for any claims that may be filed[.]" Feb. 9 Order at 13. The only question at issue in this summary proceeding is whether the evidence is sufficient to compel SIPC to take the initial step of *filing* an application for a protective decree. *Id.* In this context, the summary proceeding should be just as that term denotes – a "'prompt and simple'" proceeding. *Id.* at 10 (quoting *United States v. Hubbard*, 650 F.2d 293, 310 n.66 (D.C. Cir. 1980)). Thus, use of a probable cause standard is appropriate here.

Third, it would be inappropriate to hold the Commission, as SIPC's plenary supervisor, to a higher standard than that applied to SIPC. The Commission's plenary authority allows it to determine, notwithstanding SIPC's view, that there indeed may be customers in need of protection, under the same standard used by SIPC. This should be the rule particularly in cases such as this where the parties' disagreement is limited to issues of law. *See New Times*, 371 F.3d at 80 ("Whatever SIPC's expertise in overseeing SIPA liquidations, Congress did not intend for the Commission's interpretations of SIPA to be overruled by deference

37

to the entity that was made subject to the Commission's oversight.").  And even if

there were any material factual issues, the Commission's findings should take

precedence over SIPC's because SIPC has no comparative institutional advantage

over the Commission with respect to factual matters.  Quite to the contrary, SIPC

has a comparative disadvantage, as it has no investigative staff, no subpoena

power, and "no authority to examine its members."  Memorandum of Law in

Support of the Application of SIPC at 3, *In re BLMIS*, No. 08-cv-10791-LLS

(S.D.N.Y. filed Dec. 15, 2008), Martens First Decl. Ex. 4, attach. B.  As SIPC has

explained, "it is the function of the United States Securities and Exchange

Commission ('SEC'), or the Financial Industry Regulatory Authority ('FINRA'),

to investigate facts which, in the opinion of the SEC or FINRA, may lead to

possible action by SIPC under the Securities Investor Protection Act . . . ."  SIPC

Letter at 1.  Moreover, SIPC has no adjudicative expertise or experience.  *See id.*

("SIPC has no regulatory or investigatory role, and consequently has no personnel

which perform those functions."); SIPC's Brief in Opposition to SEC's

Application at 8 ("Opp.") (stating "SIPC has no regulatory authority").

### C. The district court's reasoning in holding that a preponderance standard applies was incorrect.

In nonetheless applying a preponderance standard, the district court

incorrectly analogized the Commission's Section 11(b) application to actions for a

permanent injunction under Section 21(e) of the Securities Exchange Act of 1934
and misconstrued the nature of this action more generally.

> **1.     There is no basis for the district court's analogy to
> Exchange Act Section 21(e).**

The district court based its conclusion that the Commission must meet a
preponderance standard largely on a novel analogy—not addressed by the
parties—between Section 21(e) of the Exchange Act, which authorizes courts to
grant injunctive relief in Commission enforcement actions, and Section 11(b) of
SIPA.  Specifically, the court noted that Section 2 of SIPA states that, except as
otherwise provided, the provisions of the Exchange Act apply to SIPA as if SIPA
were an "amendment to" and "included as a section of" the Exchange Act.  Op. at
4 (citing 15 U.S.C. 78bbb).  Because the Commission is required to prove its
entitlement to a permanent injunction under Section 21(e) of the Exchange Act by
a preponderance of the evidence, the district court believed that a preponderance
standard is required here.  Op. at 4-6.  This approach, however, misconstrues
SIPA's reference to the Exchange Act and ignores fundamental differences
between Section 21(e) of that Act and Section 11(b) of SIPA.

Although SIPA Section 2 does state that the provisions of the Exchange Act
apply to the provisions of SIPA, the fact that a preponderance standard is applied
in actions for a permanent injunction under Section 21(e) does not dictate, as the
district court seemed to believe, that the same standard applies under Section

11(b).  Indeed, as borne out in the case law cited by the district court, Section 21(e) and Section 11(b) have different purposes and authorize different proceedings.  Given the specific purpose of Section 11(b), a lesser standard of proof should be applied.  *See Bloate v. United States*, 130 S. Ct. 1345, 1354 (2010) (applying canon that a specific provision controls over a general provision).

Section 21(e) authorizes permanent injunctions against any person to deter future violations of the federal securities laws and protect the investing public generally, and is typically used in civil law enforcement actions.  *See, e.g.*, *Aaron v. SEC*, 446 U.S. 680, 685 n.3 (1980).  The purpose of an order under Section 11(b), in contrast, is to remedy a failure of SIPC in particular to commit its funds or otherwise act for the protection of a particular group of investors.  Thus, unlike the civil law enforcement proceedings in which Section 21(e) is invoked, the Commission's use of Section 11(b) is an exercise of its regulatory function as statutory supervisor of SIPC.[12]  Furthermore, a Section 21(e) action for a permanent injunction will be a plenary civil proceeding and consequently may last several months or even years.  (The underlying case in *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149 (D.C. Cir. 1978), lasted seven years.)  Section 11(b) applications,

---

[12]     We are unaware of any case in which the Commission has sought relief under Section 21(e) against an entity in an analogous relationship with the Commission, such as a self-regulatory organization.

40

by contrast, are properly resolved in a summary proceeding and are intended to be expeditious.

Most importantly here, the cases relied on by the district court stating that a preponderance standard applies in Section 21(e) actions all referred to the final determination of whether to grant a permanent injunction, which is typically made only after a full adjudication of the underlying claim of a securities law violation.[13] *See Savoy Indus.*, 587 F.2d at 1168-69; *SEC v. Moran*, 922 F. Supp. 867, 887-90 (S.D.N.Y. 1996); *SEC v. International Loan Network, Inc.*, 770 F. Supp. 678, 688 n.10 (D.D.C. 1991); *SEC v. Tome*, 638 F. Supp. 596, 620 n.45 (S.D.N.Y. 1986).  In that context, a preponderance standard makes sense.  The Commission's Section 11(b) application here, however, seeks an order requiring SIPC to make only an initial filing requesting the Receivership Court to begin the distinct liquidation proceeding created by SIPA.  Such an order would not finally determine whether there are any valid customer claims.  Those issues would be determined in a separate liquidation proceeding, and a probable cause standard is more appropriate at this preliminary stage.

---

[13]    Section 21(e) does also authorize summary proceedings to enforce Commission orders.  Such a proceeding, however, would follow a full adjudication before the Commission of the underlying issues.  *See SEC v. McCarthy*, 322 F.3d 650, 658 (9th Cir. 2003).

41

**2.      The district court failed properly to consider the statutory relationship between the Commission and SIPC.**

The district court also rejected the proposition that the Commission should not be held to a higher standard of proof than SIPC.  In doing so, that court noted that it was "mindful" that SIPC is entitled to due process in this proceeding and that the initiation of a liquidation would be costly to SIPC.[14]  Op. at 6.  In the district court's view, SIPC has the authority to determine if there are customers in need of protection in the first instance, and it is "fitting" for the Commission to be held to a higher standard in order to overturn that determination.  *Id.* at n.4.  This reasoning, however, is flawed for a number of reasons.

First, as discussed above, this proceeding is a summary one, which, like an application for a protective decree filed by SIPC in the first instance, is only a preliminary step in the adjudication of potential claims.  Therefore, regardless of the fact that SIPC has made a prior determination, it still makes no sense to require the Commission to meet the same burden of proof as claimants would in the course of a liquidation.

Second, in focusing on the potential cost and burden on SIPC in being compelled to institute a liquidation (Op. at 6), the court appears to have viewed this

---

[14]      The court did not, however, hold that due process *requires* the use of the preponderance standard.  And, indeed, use of the probable cause standard here is fully consistent with due process.  *See supra* at p. 31.

42

proceeding as no different than one between two private parties, or between the Commission and a private party with whom it deals at arm's length.  In such a situation, it may make sense for the proponent of relief to be held to a preponderance standard.  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 387-91 (1983) (explaining balance-of-interests test).  Where, as here, the Commission seeks an order requiring a congressionally created private corporation, made responsible to the Commission by statute as its plenary supervisor, to act, however, a lesser burden is appropriate.  As the Supreme Court recognized in *Barbour*, Congress specifically subjected SIPC to the supervision of the Commission, as an agency charged with the protection of the public interest, because SIPC was created to help solve a public problem.  *See* 421 U.S. at 420.  Thus, SIPA itself contemplates that the Commission's views may displace those of SIPC and the fact that they do so does not provide a reason to impose a higher standard of proof.

For the same reason, the district court erred in relying upon the general "preference for the preponderance standard in civil litigation."  Op. at 6. (citing *Huddleston*, 459 U.S. at 387-91).  As the Supreme Court made clear in *Huddleston*, that preference is but a general one, subject to rebuttal.  *See* 459 U.S. at 389.  And, as demonstrated above, a probable cause standard is more consistent

43

with the role that Congress assigned to the Commission within the overall scheme

for protecting broker-dealer customers created by SIPA.

## II.    The record provides sufficient cause to believe that there are customers who may need the protections of SIPA.

In concluding that the Commission did not show that SIPC has failed in its

obligation to act for the protection of customers, the district court employed an

unduly narrow interpretation of the term "customer" as used in SIPA.  In the

district court's view, because Stanford victims sent their funds to SIBL, rather than

SGC, they were not "customers" of SGC under SIPA.  The court's analysis,

however, improperly elevates form over substance.

Under certain circumstances, investors who have deposited funds with an

affiliate of a SIPC member can be deemed to have deposited funds with the SIPC

member itself.  Here, the Stanford entities, including SGC and SIBL, were

operated as a single fraudulent enterprise ignoring corporate boundaries.  SGC

accountholders who purchased SIBL CDs did so upon the encouragement of SGC.

Although they were instructed by SGC to deposit their payments for the CDs with

SIBL rather than SGC, the investors always dealt with SGC employees.  And

because, for such investors, their deposits with SIBL were in effect deposits with

SGC, it is overly formalistic to preclude such deposits from being treated as

deposits with SGC for purposes of SIPA.  Accordingly, the Commission believes

that SGC accountholders who purchased SIBL CDs through SGC should be

44

deemed to have deposited funds with SGC.  This interpretation of the statute to

allow for flexibility in certain circumstances is the correct one; and it is at least a

reasonable one that was entitled to deference by the district court under *Chevron,*

*U.S.A., Inc. v Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

    **A.**    **The district court's reasoning improperly elevates form over substance by strictly adhering to the corporate form of the Stanford entities rather than recognizing they were operated as a single fraudulent enterprise.**

The district court's conclusion that there was insufficient evidence to show

that Stanford victims may be "customers" under SIPA is dependent upon strict

adherence to the corporate form of the Stanford entities.  The record here,

however, provides at least probable cause to believe that the purported legal

separateness of SGC and SIBL should be disregarded such that, "by depositing

money with SIBL, [SGC accountholders] who purchased SIBL CDs were

effectively depositing cash with SGC."[15]  Analysis at 8.

_____

[15]    We note that, contrary to SIPC's contentions below (SIPC's Sur-Reply in Opposition to SEC's Application at 8), hearsay evidence may be used to satisfy the probable cause standard.  *See Hughes*, 461 F.2d at 982.  This is consistent with how summary proceedings routinely are conducted (*see New Hampshire Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 406 n.4 (1960); *McCarthy*, 322 F.3d at 655) and probable cause determinations made (*Gerstein*, 420 U.S. at 120).  SIPC itself has submitted declarations in support of its applications to initiate a liquidation.  *See* Martens First Decl. Ex. 4, attach. K (declaration attaching, among other things, filings in related judicial proceedings) & L.

Allen Stanford, the sole owner of SGC and SIBL and chairman of SIBL dominated both entities and operated them as mere tools to perpetrate a massive fraudulent Ponzi scheme (Martens Third Decl. Ex. 1 at 5-6, Ex. 2 at ¶¶ 8-28, Ex. 5 at ¶ 5, Ex. 6 at 3149, 3161-64; *see Janvey*, 793 F. Supp. 2d at 828, 856-57).  Both entities were not just severely undercapitalized, but insolvent from the scheme's inception.  Martens Third Decl. Ex. 2 at ¶¶ 19, 27; *see Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011); Analysis at 10 n.33 (citing cases).

Moreover, the Stanford entities were operated in a highly interconnected manner and corporate formalities were not respected.  Receiver's Report at 7.  The entities lacked a typical management hierarchy or governance structure, and the actual structure appears to have been designed to obfuscate holdings and transfers of cash and assets.  *See* Receiver's Report at 5-6.  Money was shunted among the Stanford-controlled entities irrespective of legitimate business purposes, *see id*. at 6-7, and, just in the five-year period from 2004 through 2008, over *half a billion dollars* of misappropriated funds were funneled back from SIBL to SIPC member SGC, Martens Third Decl. Ex. 2 at ¶¶ 26-28.  SGC could not have stayed afloat without the influx of misappropriated investor funds.  *See id.*  Virtually the entire remainder of misappropriated investor funds were controlled and used by Stanford himself.  *See* Receiver's Report at 7; Martens Third Decl. Ex. 2 at ¶15.

46

In these circumstances, to adhere to the purportedly separate existences of SIBL and SGC to deny customer status "would elevate form over substance by honoring a corporate structure designed by Stanford in order to perpetrate an egregious fraud." Analysis at 11. Courts in SIPA liquidations faced with similar circumstances have disregarded the corporate separateness of SIPC members and non-member affiliated companies, with SIPC's support. *See*, *e.g.*, *New Times*, 371 F.3d at 73; *In re New Times Secs. Servs., Inc.*, No. 8-00-8178-jbr, at 3-4 (Bankr. E.D.N.Y. Nov. 27, 2000) ("Consolidation Order"). In *New Times*, the court applied the equitable bankruptcy law doctrine of substantive consolidation[16] to disregard the corporate separateness of an introducing broker that was a SIPC member and its non-SIPC member affiliate. As a result, as urged by the SIPA trustee—with the support of SIPC—and by the Commission, the two entities were treated the as a single debtor for the purposes of determining "customer" claims under SIPA. *See* Consolidation Order at 3-4.

SIPC has also supported such consolidation in other SIPA liquidations. *See, e.g.*, *SIPC v. Bernard L. Madoff Investment Secs. LLC*, Adv. Pro. No. 08-1789 (BRL), Order at 4, ¶ L (Bankr. S.D.N.Y June 10, 2009); *In re Lewellyn*, 26 B.R. 246, 250-54 (Bankr. S.D. Iowa 1982); *In re Atkeison (Ambassador Church*

---

[16]    *See In re Auto-Train Corp., Inc.*, 810 F.2d 270, 276 (D.C. Cir. 1987); *In re Babcock and Wilcox Co.*, 250 F.3d 955, 958 n.5 (5th Cir. 2001).

47

*Fin./Devel. Group)*, 446 F.Supp. 844, 846 (M.D. Tenn. 1977).[17]  And, the court overseeing the Stanford receivership, in the context of an analysis under Chapter 15 of the Bankruptcy Code, has concluded that the corporate fictions of the Stanford entities should be disregarded.  *See In re Stanford Int'l Bank, Ltd.*, No. 3:09-CV-0721-N, at 26-36 (N.D. Tex. July 30, 2012).  That court further concluded that, if the substantive consolidation doctrine applied in the non-bankruptcy receivership proceeding, "the evidence *overwhelmingly* supports substantive consolidation."  *Id.* at 35 (emphasis added).[18]

---

[17]       *See also* Letter from Debbie Dudley Branson, Acting Chairman, and Michael E. Don, President, SIPC to Richard Hillman, Director, Financial Markets and Commodity Investment, United States General Accounting Office (dated April 27, 2001), at p. 7, Appendix I to Securities Investor Protection: Steps Needed to Better Disclose SIPC Policies to Investors, United States General Accounting Office (May 2001) [GAO 01-653], available at http://www.gao.gov/new.items/d01653.pdf (last accessed Jan. 9, 2013) (describing SIPC support of substantive consolidation in the SIPA liquidations of additional broker-dealers).

[18]       In determining whether to substantively consolidate entities, the various factors relevant to the analogous veil-piercing doctrine under applicable state law may be considered.  *See, e.g.*, *In re Lewellyn*, 26 B.R. at 250-54.  Under Texas law, which can be expected to govern here as SGC and SIBL both have principal places of business in Houston, Texas, the corporate fiction may be disregarded where, "even though corporate formalities have been observed and corporate and individual property have been kept separately, . . .  the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *Castleberry v. Branscum*, 721 S.W.2d 270, 271-72 (Tex. 1986).

While we are not advocating that every customer of every Stanford entity could have "customer" status under SIPA, the Commission believes that, if the separate corporate forms of SGC and SIBL are disregarded, SGC accountholders who purchased CDs through SGC and deposited funds with SIBL should have "customer" status. [19]  Thus, the facts shown below suggesting that the corporate separateness of these Stanford entities should be disregarded established probable cause to believe that SIPC has refused to act for the protection of "customers" under the Act.[20]

---

[19]     While, as the district court noted, some courts have observed that SIPA's customer definition is to be construed narrowly, courts also have recognized that SIPA is remedial legislation that should be construed flexibly to effectuate its purposes, *see, e.g.*, *New Times*, 371 F.3d at 84 (citing canon of construction and accepting the Commission's "broader reading" of SIPA Section 9(a)(1), 15 U.S.C. 78fff-3(a)(1)); *In re Bell & Beckwith*, 66 B.R. 703, 705 (N.D. Ohio 1986); *In re First State Secs. Corp.*, 34 B.R. 492, 496 (Bankr. S.D. Fla. 1983); *In re Mirus*, 87 B.R. 960, 969 (Bankr. N.D. Ill. 1988).  The disregard of corporate forms through substantive consolidation, having been used by courts in SIPA liquidations and supported by SIPC, is an established example of such flexible construction.  In any event, the notion of narrow construction is not a basis to deny protection to investors who come within the scope of the Act.

[20]     SIPC has contended that a substantive consolidation of SGC and SIBL would result in investors' claims being claims "for cash or securities that form a part of the brokerage's capital[,]" thereby negating customer status.  Opp. at 27 (internal quotation marks omitted); *see* SIPC Letter at 3.  As the Commission explained (Analysis at 11-12), however, the relevant case law uniformly holds that this statutory exclusion is inapplicable where, as here, the claimants did not intend to loan money to the broker-dealer.  *See In re Primeline*, 295 F.3d at 1109; *In re Old Naples*, 223 F.3d at 1304; *In re C.J. Wright*, 162 B.R. at 606.

**B.    Even apart from the lack of separateness of the corporate entities, SIPA's "customer" definition includes those who can be deemed to have deposited cash with a broker-dealer under the *Old Naples* and *Primeline* cases.**

Even if there were not sufficient cause to believe that SGC and SIBL should be treated as the same entity, as the Commission discussed in its analysis, two court of appeals cases interpreting SIPA's "customer" definition have held that its scope does not depend simply on the identity of the entity to which funds are initially provided.

In *Old Naples*, an introducing SIPC-member brokerage firm (Old Naples Securities) was owned and operated by James Zimmerman, who also owned and operated non-SIPC-member Old Naples Financial Services that was not a securities brokerage. *See* 223 F.3d at 1299-1300. Zimmerman solicited clients through the broker and customers either made checks payable to Old Naples Securities or wired funds directly to Old Naples Financial Services. Rather than using the funds to purchase bonds, Zimmerman used them to pay the expenses of Old Naples Securities as well as his personal expenses. *Id.* at 1300.

In finding that customers who wired funds to Old Naples Financial Services were "customers" protected by SIPA, the Eleventh Circuit pointed to evidence that the investments were offered by an employee of Old Naples Securities, investor payments to Old Naples Financial Services were made at the broker's direction, and investors received a letter from Old Naples Securities regarding their

50

investment. *Id.* at 1301. The court also found it clear that the claimant's "funds, although initially deposited with Old Naples Financial Services, were used by, or at least for, Old Naples Securities." *Id.* at 1303. In the court's view, it was not necessary for "customer" status there to find that the two entities were "in effect a single entity" because the funds of the claimants "were used by the owner of Old Naples Securities for the benefit of Old Naples Securities." *Id.* at 1304 n.16.

Similarly, in *Primeline*, a sales representative at an introducing SIPC-member brokerage firm operated a Ponzi scheme by soliciting client funds for "investment opportunities" and corporate "debentures." 295 F.3d at 1103-04. Clients made their checks payable to the sales representative or non-SIPC-member corporations created and controlled by him, and he diverted the funds for his personal use. *See id.* at 1104. Relying on *Old Naples*, the court concluded that the investors were "customers" under SIPA because the clients met with the broker at the brokerage firm's offices, received a business card reflecting the broker's position at the firm, completed new account forms with the firm, followed the broker's instructions with regard to the delivery of their funds for investment, and received fraudulent statements on firm letterhead. *Id.* at 1107-08.

Both of these cases thus expressly rejected the notion that "customer" status requires that cash be deposited directly with the broker-dealer, and concluded that, under the facts and circumstances of those cases, the investors involved had

51

"deposited" cash with "the debtor" within the meaning of SIPA's "customer" definition. Here, there is evidence showing that there are Stanford victims who had accounts at SGC, dealt solely with SGC representatives, and paid for their CDs in accordance with SGC's instructions. Moreover, while customers' funds were sent to a purportedly separate non-SIPC-member sister entity, SIBL, that corporate separateness was suspect at best and the funds were in fact routed back to SGC or otherwise diverted for the use of SGC's sole owner. As the Commission determined, consistent with the courts' conclusions in *Old Naples* and *Primeline*, these facts support a finding that some SGC accountholders are "customers" under SIPA.

The district court, however, incorrectly distinguished those cases. First, the court asserted that, unlike in this case, the funds in *Old Naples* and *Primeline* were never deposited with the relevant clearing broker, "in clear violation of proper operating procedure."[21] Op. at 16. But the district court was incorrect in implying that, by contrast, *all* CD purchasers' funds here were deposited with a clearing broker. Op. at 17. As SIPC and the Commission stipulated, some CD purchasers "wrote checks that were deposited into SIBL accounts . . . for the purpose of opening their accounts at SIBL and purchasing CDs" (Stipulated Facts ¶ 3), and

---

[21]      In *Old Naples*, the funds of at least one customer, Eileen Brown, were in fact deposited with the clearing broker. *See Old* Naples, 223 F.3d at 1299, 1300-01; *In re Old Naples Sec., Inc.*, 218 B.R. 981, 984-85 (Bankr. M.D. Fla. 1998).

there are examples of checks made payable to SIBL in the record (Opp. Exs. 12, 13). Those investors' funds were deposited directly in SIBL accounts and, just as the district court viewed the funds in *Old Naples* and *Primeline*, were never deposited with a clearing broker.

And even if some funds here were deposited with SGC's clearing broker, there is nothing in the *Old Naples* and *Primeline* opinions suggesting that the general absence of such an initial step in the flow of funds was material to their holdings. Quite the opposite. The major thrust of the *Old Naples* opinion is that "customer" status "*does not . . . depend*" "simply on to whom the claimant handed her cash or made her check payable, or even where the funds were *initially* deposited." 223 F.3d at 1302 (emphasis added). The court found "customer" status because the broker-dealer subsequently "acquired control over all of the claimants' funds." *Id.* at 1303-04. The court in *Primeline* echoed this holding and specifically rejected SIPC's argument that the fact that the checks were not made payable to Primeline's clearing broker indicated the claimants were *not* customers. *See* 295 F.3d at 1107.

The district court also incorrectly distinguished *Old Naples* and *Primeline* based on its view that no securities were ever "actually purchased" in those cases whereas here SIBL CDs "were in fact purchased." Op. at 17. In *Primeline*, some investors in fact "received fraudulent 'Debenture Certificates'" "*[i]n exchange for*

53

*their cash*." 295 F.3d at 1109 (emphasis added). Those fraudulent Debenture Certificates were "purchased" in as much of a sense as the fraudulent certificates of deposit here were "purchased," and the *Primeline* court had no difficulty concluding that those investors were SIPA "customers." *See id.*

In addition, the district court's view that SIBL CDs were in fact purchased ignores the fact that the SIBL CDs are "in actuality, nothing more than participatory interests in a Ponzi scheme." Analysis at 12-14. SGC was insolvent at the moment cash was deposited and "a victim of a Ponzi scheme perpetrated by a brokerage firm is entitled to recovery of his net cash investment in the Ponzi scheme." Reply at 21. Thus, as in other cases involving Ponzi schemes, the issuance of these securities should be disregarded. *See In re BLMIS*, 654 F.3d at 237-242 (disregarding fictitious securities positions and valuing customer claims based on investors' net cash investment); *Old Naples*, 311 B.R. at 615-17; *C.J. Wright*, 162 B.R. at 610.

## C.  The Commission's interpretation of SIPA's "customer" definition is at least reasonable and warrants *Chevron* deference.

At a minimum, the Commission's interpretation of SIPA's "customer" definition to allow some flexibility in circumstances such as those here is reasonable and warrants deference under *Chevron* that the district court erroneously declined to give. In so refusing, the district court neither questioned that SIPA's "customer" definition is a provision that Congress entrusted to the

54

Commission's administration (see supra at 7) nor questioned the formality with which the Commission issued its interpretation.  Rather, the court declined to give deference based on a perceived inconsistency with past statements of the Commission that were neither addressed nor even cited by the parties.  Specifically, it pointed to past statements by the Commission that investors using an introducing broker are customers of the associated clearing broker for purposes of SIPA.  As explained below, however, under certain circumstances, such investors can also be "customers" of the introducing firm, and the court thus perceived an inconsistency where there actually is none.

The Commission's past statements make clear that while, as the Commission expressly noted in its analysis (see Analysis at 6), there is indeed a general presumption that investors are not customers of an introducing broker for SIPA purposes, there is a group of exceptions that is broader than the district court acknowledged.  See, e.g., Net Capital Rule, Release No. 34-31511, 57 F.R. 56973-01, 56978 n.17 (Dec. 2, 1992) (listing examples of situations in which SIPC exposure has resulted from the failure of introducing brokers); Release No. 34-33517, 59 FR 4297-01, 4298 (Jan. 31, 1994) (describing circumstances in which the Commission deems the introducing member to be a firm in possession of customer funds or securities subject to higher net capital requirements."); accord Release 34-31512, 57 FR 57027-01, 57029 (Dec. 2, 1992); Release 34-27249, 54

55

FR 40395-01, 40399 (Oct. 2, 1989).[22]  Indeed, the Commission filed a brief in the

bankruptcy court in *New Times* supporting the substantive consolidation of an

introducing broker and its affiliated non-SIPC member, and advocated that

customers of the affiliated non-member be considered "customers" of the

introducing broker under SIPA.  *See* Response of United States Securities and

Exchange Commission, at p.7, *In re New Times Secs. Servs., Inc.*, No. 8-00-8178-

jbr (Bankr. E.D.N.Y. filed Nov. 27, 2000).

Thus, the Commission's interpretation, under which investors who can be

deemed to have deposited cash with an introducing broker can be considered

customers of that firm for purposes of SIPA, is fully consistent with the

Commission's past statements.[23]  *See Thomas Jefferson Univ. v. Shalala*, 512 U.S.

---

[22]    A 1997 release on which the district court relied states the general presumption and, not surprisingly, does not discuss the various exceptions because the subject was only tangential to the issue under consideration there: whether introducing brokers qualify as small businesses for the purposes of the Regulatory Flexibility Act.  *See generally* Release Nos. 7382 *et al.*, 63 SEC Docket 1671 (Jan. 22, 1997).  The 1985 document the district court cites is a staff letter that simply recites the general presumption.  Letter from Richard G. Ketchum, Director, Division of Market Regulation to David Marcus, New York Stock Exchange, *et al.* (dated Jan. 14, 1985), available at http://www.sec.gov/divisions/marketreg/mr-clearing011485.pdf (last accessed Jan. 9, 2013).  Significantly, the staff letter notes circumstances where an the introducing firm will be deemed to have financial responsibility for its customers' accounts.  *See id.* at 2.

[23]    Even if the Commission's position here is thought to fall outside of the categories of exceptions to the general rule already articulated, it is not inconsistent with the Commission's past statements to create an additional exception.

504, 515-16 (1994) (finding no inconsistency where prior statement, by "its own terms," reviewed "only a number of [potentially relevant] situations") (internal quotation marks omitted); *American Petroleum Inst. v. EPA*, 684 F.3d 1342, 1348-49 (D.C. Cir. 2012) (finding no inconsistency where agency's guidelines stated it "generally" relies only on peer-reviewed studies and agency relied on non-peer-reviewed study); *Cablevision Systems Corp. v. FCC*, 649 F.3d 695, 710 (D.C. Cir. 2011) (finding no inconsistency because, among other reasons, prior statements were distinguishable) (internal quotation marks omitted). And, as a result, the district court erred in failing to defer to the Commission's reasonable interpretation of a statute entrusted to its administration.

## CONCLUSION

For the foregoing reasons, the Commission has shown that SIPC should be required to file an application for a protective decree as to Stanford Group Company in the District Court for the Northern District of Texas, and the order of the district court below should be reversed.

Respectfully submitted,

MICHAEL A. CONLEY
Deputy General Counsel

JACOB H. STILLMAN
Solicitor

JOHN W. AVERY
Deputy Solicitor

TRACEY A. HARDIN
Assistant General Counsel


/s/ Michael L. Post
MICHAEL L. POST
Senior Litigation Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-5011 (Post)


January 2013

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of FRAP

32(a)(7)(B) because:

this brief contains 13,676 words, excluding the parts of the brief

exempted by FRAP 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2.     This brief complies with the typeface requirements of FRAP 32(a)(5)

and the type-style requirements of FRAP 32(a)(6) because:

this brief has been prepared in a proportionally spaced typeface using

Word 2010 in 14 point Times New Roman type.


/s/ Michael L. Post
MICHAEL L. POST
Senior Litigation Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-5011 (Post)


Dated:  January 11, 2013

**STATUTORY ADDENDUM**

# TABLE OF CONTENTS

Page

SIPA Section 2, 15 U.S.C. § 78bbb .............................................................. A-1

SIPA Section 11(b), 15 U.S.C. § 78ggg(b)..................................................... A-2

SIPA Section 16(2), 15 U.S.C. § 78*lll*(2) ..................................................... A-3

Securities Exchange Act of 1934 Section 21(e), 15 U.S.C. § 78u(e)................. A-5

**SIPA Section 2, 15 U.S.C. § 78bbb**

Application of Securities Exchange Act of 1934

Except as otherwise provided in this chapter, the provisions of the Securities Exchange Act of 1934 [15 U.S.C.A. § 78a et seq.] (hereinafter referred to as the "1934 Act") apply as if this chapter constituted an amendment to, and was included as a section of, such Act.

**SIPA Section 11(b), 15 U.S.C. § 78ggg(b)**

Enforcement of actions

In the event of the refusal of SIPC to commit its funds or otherwise to act for the protection of customers of any member of SIPC, the Commission may apply to the district court of the United States in which the principal office of SIPC is located for an order requiring SIPC to discharge its obligations under this chapter and for such other relief as the court may deem appropriate to carry out the purposes of this chapter.

**SIPA Section 16(2), 15 U.S.C. § 78***lll***(2)**

Definitions

For purposes of this chapter, including the application of the Bankruptcy Act to a liquidation proceeding:

*     *     *

(2) Customer

(A) In general

The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer.

(B) Included persons

The term "customer" includes--

(i) any person who has deposited cash with the debtor for the purpose of purchasing securities;

(ii) any person who has a claim against the debtor for cash, securities, futures contracts, or options on futures contracts received, acquired, or held in a portfolio margining account carried as a securities account pursuant to a portfolio margining program approved by the Commission; and

(iii) any person who has a claim against the debtor arising out of sales or conversions of such securities.

A-3

(C) Excluded persons

The term "customer" does not include any person, to the extent that--

    (i) the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or

    (ii) such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

**Securities Exchange Act of 1934 Section 21(e), 15 U.S.C. § 78u(e)**

Mandamus

Upon application of the Commission the district courts of the United States and the United States courts of any territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus, injunctions, and orders commanding (1) any person to comply with the provisions of this chapter, the rules, regulations, and orders thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or person associated with a member, the rules of a registered clearing agency in which such person is a participant, the rules of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm or a person associated with such a firm, the rules of the Municipal Securities Rulemaking Board, or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, (2) any national securities exchange or registered securities association to enforce compliance by its members and persons associated with its members with the provisions of this chapter, the rules, regulations, and orders thereunder, and the rules of such exchange or association, or (3) any registered clearing agency to enforce compliance by its participants with the provisions of the rules of such clearing agency.

## CERTIFICATE OF SERVICE

I hereby certify that, on January 11, 2013, I caused the foregoing brief to be

served by ECF on all parties to this appeal as follows:

> Josephine Wang
> General Counsel
> Security Investor Protection Corporation
> 805 15th Street, NW
> Washington, DC 20005
> (202) 371-8300
> jwang@sipc.org
>
> Eugene F. Assaf
> KIRKLAND & ELLIS LLP
> 655 15th Street, NW, Suite 1200
> Washington, DC 20005
> (202) 879-5000
> eugene.assaf@kirkland.com
>
> *Counsel for Securities Investor Protection Corporation*

> /s/ Michael L. Post
> MICHAEL L. POST
> Senior Litigation Counsel
> Securities and Exchange Commission
> 100 F Street, N.E.
> Washington, D.C. 20549
> (202) 551-5011 (Post)